# Supreme Court of Florida

_____

No. SC19-1341
_____

**ADVISORY OPINION TO THE GOVERNOR RE: IMPLEMENTATION OF AMENDMENT 4, THE VOTING RESTORATION AMENDMENT.**

January 16, 2020

PER CURIAM.

By letter dated August 9, 2019, Governor Ron DeSantis requested the opinion of the justices of this Court as to the interpretation of a portion of the Florida Constitution upon a question affecting his executive powers and duties. We have jurisdiction. *See* art. IV, § 1(c), Fla. Const.

Specifically, the Governor requests advice regarding the meaning of certain language that was added to article VI, section 4 of the Florida Constitution by the approval on November 6, 2018, of an initiative petition—commonly referred to as "Amendment 4"—that restores the voting rights of certain convicted felons "upon completion of all terms of sentence including parole or probation." Art. VI, § 4(a), Fla. Const. The Governor asks whether the phrase "all terms of sentence" encompasses legal financial obligations (LFOs)—fines, restitution, costs, and

fees—ordered by the sentencing court. We answer in the affirmative, concluding

that "all terms of sentence" encompasses not just durational periods but also all

LFOs imposed in conjunction with an adjudication of guilt.

The Governor's letter in relevant part states:

I request your interpretation of whether "completion of all terms of sentence" encompasses financial obligations, such as fines, fees and restitution ("legal financial obligations" or "LFOs") imposed by the court in the sentencing order.

Prior to Amendment 4's placement on the ballot, this Court was asked to determine whether the amendment met the legal requirements under Florida's Constitution. On March 6, 2017, during a colloquy between the justices and Amendment 4's sponsor, Floridians for a Fair Democracy ("Sponsor"), this Court was assured the Amendment presented a "fair question" and "clear explanation" to voters. Transcript of Oral Argument at 2, *Advisory Op. to the Attorney General Re: Voting Restoration Amend.*, 215 So. 3d 1202 (Fla. 2017) (Nos. SC16-1785 and SC16-1981). Addressing a question posed by Justice Polston as to whether "completion of [all] terms" included "full payment of any fines," the Sponsor responded, "Yes, sir . . . All terms means all terms within the four corners." *Id.* at 4. Justice Lawson similarly asked, "You said that terms of sentence includes fines and costs . . . that's the way it's generally pronounced in criminal court, would it also include restitution when it was ordered to the victim as part of the sentence?" *Id.* at 10. The Sponsor answered, "Yes." *Id.* Justice Pariente posited the inclusion of fees, fines, and restitution as part of the completion of sentence "would actually help the state because if fines, costs and restitution are a requirement . . . for those that want to vote, there's a big motivation to pay unpaid costs, fines and restitution." *Id.* at 11. Ultimately, the Court found Amendment 4 clearly and unambiguously informed voters the chief purpose of the proposed amendment was to "automatically restore voting rights to felony offenders, except those convicted of murder or felony sexual offenses, *upon completion of all terms of their sentence*." *Advisory Op.*, 215 So. 3d at 1208 (emphasis added).

- 2 -

In alignment with the colloquy with the Florida Supreme Court, after Amendment 4 was approved by voters, the ACLU of Florida, League of Women Voters of Florida, LatinoJustice, and the Florida Rights Restoration Coalition delivered a letter to former Secretary of State Ken Detzner regarding implementation of Amendment 4. Exhibit 1, December 13, 2018 Letter. In part, the letter explained,

> The phrase "completion of all terms of sentence" includes any period of incarceration, probation, parole and financial obligations imposed as part of an individual's sentence. *The financial obligations may include restitution and fines, imposed as part of a sentence or a condition of probation under existing Florida statute. Fees not specifically identified as part of a sentence or a condition of probation are therefore not necessary for 'completion of sentence' and thus, do not need to be paid before an individual may register.* We urge the Department to take this view in reviewing eligibility of individuals registered to vote as outlined in Chapter 98, Florida Statutes.

Ex. 1, p. 3 (emphasis added).

During the 2019 Legislative Session, legislators in both chambers debated legislative implementation of Amendment 4. Ultimately, both chambers passed CS/SB 7066 and, on June 28, 2019, I signed it into law. *See* Ch. 2019-162, Laws of Fla. In relevant part, chapter 2019-162, section 25, Laws of Florida, creating section 98.0751, Florida Statutes, provided guidance on restoration of voting rights and determination of ineligibility pursuant to the amendment of Article VI, section 4 of the Florida Constitution. Section 98.0751, Florida Statutes, defines "[c]ompletion of all terms of sentence" as "any portion of a sentence that is contained in the four corners of the sentencing document." § 98.0751(2)(a), Fla. Stat. (2019). The Legislature provided five categories of terms included in the sentencing document: . . . (5) full payment of LFOs ordered by the court as part of the sentence. *See* § 98.0751(2)(a)l.-5., Fla. Stat. (2019).

On June 15, 2019, Luis Mendez filed a complaint in the Northern District of Florida seeking injunctive and declaratory relief and mandamus challenging chapter 2019-162, Laws of Florida. In

part, Mendez alleges chapter 2019-162, Laws of Florida, violates Article VI, section 4 of the Florida Constitution because it adds requirements for the restoration of voting rights above what was prescribed in the Florida Constitution. Additional complaints were filed by numerous plaintiffs, including organizations referenced above, alleging provisions of chapter 2019-162, Laws of Florida violate the First, Eighth, Fourteenth and Twenty-Fourth Amendments of the United States Constitution. These challenges are only directed at chapter 2019-162, Laws of Florida, and do not question the constitutionality of Article VI, section 4 of the Florida Constitution.

Article IV, section 1(a) of the Florida Constitution prescribes the supreme executive power shall be vested in the Governor, that he "shall take care that the laws be faithfully executed" and "transact all necessary business with the officers of government." Article IV, section 6 of the Florida Constitution places direct administration and supervision of all functions of the executive branch, including the Department of State, under the constitutional authority of the Governor. *See also* § 20.02(3), Fla. Stat. (the administration of any executive branch entity shall at all times be ["]under the constitutional executive authority of the Governor"); § 20.10, Fla. Stat. (creating the Department of State, headed by the Secretary of State who is appointed by the Governor). Furthermore, the Secretary of State is the chief elections officer with the responsibility to maintain uniformity in the interpretation and implementation of voter registration and election laws. *See* § 97.012, Fla. Stat.

. . . .

I, as Governor of Florida, . . . want to ensure the proper implementation of Article VI, section 4 of the Florida Constitution and, if applicable, chapter 2019-162, Laws of Florida. This includes the ability to direct the Department of State to fully implement Article VI, section 4 of the Florida Constitution by determining whether a convicted felon has completed *all* terms of their sentence, including the satisfaction of LFOs. I will not infringe on the proper restoration of an individual's right to vote under the Florida Constitution.

Understanding there is ongoing litigation in federal court challenging chapter 2019-162, Laws of Florida under the First, Eighth, Fourteenth and Twenty-Fourth Amendments of the United States Constitution, I do not ask this Court to address any issues regarding chapter 2019-162, Laws of Florida or the United States Constitution.

Therefore, I respectfully request an opinion of the Justices of the Supreme Court of Florida as to the question of whether "completion of all terms of sentence" under Article VI, section 4 of the Florida Constitution includes the satisfaction of all legal financial obligations—namely fees, fines and restitution ordered by the court as part of a felony sentence that would otherwise render a convicted felon ineligible to vote.

Letter from Governor Ron DeSantis to Chief Justice Charles T. Canady dated August 9, 2019, at 1-4 (some alterations in original) (footnote omitted).

After concluding that the Governor's request was within the purview of article IV, section 1(c) of the Florida Constitution, we agreed to exercise our discretion to provide an advisory opinion. We also permitted interested parties to file briefs and to present oral argument before the Court. *See* art. IV, § 1(c), Fla. Const.[1] During oral argument, counsel for the Governor made clear that the Governor requests advice solely as to the narrow question of whether the phrase

---

1. Timely initial briefs were submitted by the following: (1) Governor Ron DeSantis; (2) The Florida Senate; and Bill Galvano, in his official capacity as President of the Florida Senate; (3) The Florida House of Representatives; (4) Secretary of State, Laurel M. Lee; (5) Adam Richardson; (6) Mark R. Schlakman, joined by The Florida Association of Criminal Defense Lawyers; (7) Fair Elections Center; (8) The American Civil Liberties Union Foundation of Florida, American Civil Liberties Union Foundation, NAACP Legal Defense and Educational Fund, Inc., Brennan Center for Justice at NYU School of Law, Florida State Conference of Branches and Youth Units of the NAACP, Orange County Branch of the NAACP, and League of Women Voters of Florida; (9) Jennifer LaVia and Carla Laroche; and (10) Bonnie Raysor, Diane Sherrill, and Lee Hoffman.

"all terms of sentence" includes LFOs ordered by the sentencing court. We answer only that question.

The arguments presented by the interested parties generally fall into one of two categories. On the one hand, the Governor, the Florida Senate, the Florida House of Representatives, and the Secretary of State (collectively, the State Parties) all argue that "all terms of sentence" includes all LFOs ordered by the sentencing judge. They largely rely on plain language, case law, and the common understanding of penalties imposed for criminal acts. On the other hand, the remaining interested parties (collectively, the Non-State Parties) present varying arguments against some or all LFOs being included within the scope of "all terms of sentence." Some Non-State Parties argue that "all terms of sentence" refers to durational periods rather than to obligations and thus contemplates only periods of imprisonment and supervised release. Others assume that "all terms of sentence" refers to obligations including some LFOs, but they argue for the exclusion of certain LFOs. These latter Non-State Parties focus on what they label as punitive aspects of a sentence and on what they consider to be the technical components of a criminal sentence.

The answer to the Governor's question largely turns on whether "all terms of sentence" encompasses all obligations or only durational periods. We conclude that the phrase, when read and understood in context, plainly refers to obligations

and includes "all"—not some—LFOs imposed in conjunction with an adjudication of guilt. Before explaining our opinion, we briefly address our jurisdiction as well as the Secretary of State's concerns that the events leading up to the adoption of Amendment 4 and the subsequent legal challenges to chapter 2019-162 amount to a "bait and switch" attempt to amend our State's governing document.

## JURISDICTION

Article IV, section 1(c) of the Florida Constitution authorizes the Governor to "request in writing the opinion of the justices of the supreme court as to the interpretation of any portion of this constitution upon any question affecting the governor's executive powers and duties." Upon receiving such a request, "the justices shall determine whether the request is within the purview of article IV, section 1(c)." Fla. R. App. P. 9.500(b). Here, we readily concluded that the Governor's question is answerable. In particular, the question affects the Governor's constitutional responsibility to "take care that the laws be faithfully executed," art. IV, § 1(a), Fla. Const., and the exercise of his clemency powers, art. IV, § 8(a), Fla. Const.

Certain Non-State Parties nevertheless question our jurisdiction, but their arguments are meritless. These Non-State Parties argue, for example, that it is inappropriate for this Court to issue an advisory opinion on the constitutionality of a statute and that the Governor in effect impermissibly seeks advice regarding the

necessity or validity of chapter 2019-162 and the interpretation of its provisions. But neither the existence of chapter 2019-162 nor the possibility that our advice may touch upon that legislation precludes us from answering the Governor's question. Indeed, though the Governor's request does not ask us directly to address the constitutionality of chapter 2019-162, we note that this Court since 1968[2] has issued advisory opinions to the Governor addressing the validity of legislation that affected his executive powers and duties. *E.g.*, *In re Advisory Opinion of Governor Civil Rights*, 306 So. 2d 520, 521-22 (Fla. 1975) (concluding that the Florida Correctional Reform Act of 1974—an act that had already been signed into law and that purported to reinstate the civil rights of convicted felons under certain circumstances—"constitute[d] a clear infringement upon the constitutional power of the Governor to restore civil rights").[3] In any event, given the narrow question presented here, we need not address chapter 2019-162.

---

2. The 1968 Constitution for the first time permitted interested parties to be heard in advisory opinion cases. *See In re Advisory Opinion to Governor*, 243 So. 2d 573, 576 (Fla. 1971) (examining the constitutionality of a proposed corporate income tax and recognizing that "Section 1(c), Article IV, Constitution of 1968, enlarged to some extent the power of this Court to be of assistance"); *Opinion to the Governor*, 239 So. 2d 1, 8 (Fla. 1970) (examining the constitutionality of the 1970 General Appropriations Act and recognizing that it was "noteworthy that in the 1968 constitutional revision, authority and direction were given this Court to permit interested persons to be heard").

3. *Civil Rights* reiterated this Court's long-held view "that the power of pardon is reposed exclusively in the . . . executive" and is not to be infringed upon by the other branches. 306 So. 2d at 522; *see also Sullivan v. Askew*, 348 So. 2d

- 8 -

These Non-State Parties additionally argue among other things that the Governor's request impermissibly concerns the duties of his subordinates rather than his sole authority. But in *Advisory Opinion to Governor—1996 Amendment 5 (Everglades)*, 706 So. 2d 278, 280-81 (Fla. 1997), this Court's conclusion that the question there fell "within the purview of article IV, section 1(c)" was based in part on the fact that the constitutional amendment at issue directly affected the Governor's constitutional duty to faithfully execute the laws, including the duty to provide certain agencies "with direction as to their enforcement responsibilities." Here, the Governor's question about the meaning of Amendment 4 similarly affects among other things his general constitutional duties, including the duty to provide the Department of State with necessary direction regarding the implementation of voter registration laws.

The Governor's request satisfies the requirements of article IV, section 1(c).

## AMENDMENT 4—BACKGROUND

Prior to Amendment 4's adoption, article VI, section 4(a) of the Florida Constitution permanently disenfranchised all felons absent a grant of executive clemency. *See Richardson v. Ramirez*, 418 U.S. 24, 54 (1974) ("[T]he exclusion

312, 315 (Fla. 1977) (noting that article IV, section 8 of the Florida Constitution "vest[ed] sole, unrestricted, unlimited discretion exclusively in the executive" in restoring civil rights).

- 9 -

of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment . . . .").  The text of Amendment 4, which amended article VI, section 4, provided in pertinent part:

> Article VI, Section 4. **Disqualifications.—**
>
> (a) No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability.  <u>Except as provided in subsection (b) of this section, any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation.</u>
>
> (b) <u>No person convicted of murder or a felony sexual offense shall be qualified to vote until restoration of civil rights.</u>

In 2016—two years before the voters approved Amendment 4—this Court was asked by the Attorney General whether Amendment 4 met the legal requirements for placement on the ballot.  *Advisory Op. to Att'y Gen. re Voting Restoration Amendment*, 215 So. 3d 1202 (Fla. 2017).  This Court unanimously answered in the affirmative.  *Id.* at 1209.  In its brief to this Court arguing in support of Amendment 4 being placed on the ballot, Amendment 4's sponsor, Floridians for a Fair Democracy (the Sponsor), asserted: "Specifically, the drafters intend that individuals with felony convictions, excluding those convicted of murder or a felony sexual offense, will automatically regain their right to vote *upon fulfillment of all obligations imposed under their criminal sentence*."  Initial Brief of Sponsor at 2, *Advisory Op. to Att'y Gen. re Voting Restoration*

- 10 -

*Amendment*, 215 So. 3d 1202 (Fla. 2017) (Nos. SC16-1785 & SC16-1981) (emphasis added). In other words, the Sponsor intended that "all terms" refer to obligations, not durational periods. No briefs were submitted in opposition to Amendment 4.

Oral argument in that case took place on March 6, 2017. During the oral argument, counsel for the Sponsor stated—consistent with the Sponsor's brief—that the operative language in Amendment 4 "means all matters—anything that a judge puts into a sentence." As noted in the Governor's letter, that oral argument involved discussion of LFOs—including fines, costs, and restitution—as well as the process for confirming payment of LFOs. Counsel for the Sponsor summed up by reiterating that Amendment 4 was intended to be "a restoration of voting rights under these specific conditions." It is beyond dispute that the Sponsor expressed the intention that "all terms of sentence" include all LFOs ordered by the sentencing judge.

As the Secretary notes here, the Sponsor advertised a similar message to the voting public via its "Paid Political Advertisement" website. *See* Initial Brief of Secretary of State at 7, and App. at 33-68. Among other things, the website states in bold-italicized text that "Amendment 4 restores the eligibility to vote to people with past felony convictions who ***fully complete*** their entire sentence – including any probation, parole, and restitution – before earning back the eligibility to vote."

- 11 -

As the Secretary also notes, similar messages were disseminated by some of the very same nonprofit organizations that are currently involved in the lawsuits challenging chapter 2019-162 and that now argue to this Court that "all terms of sentence" simply refers to durational periods. *See* Initial Brief of Secretary at 9. For example, the American Civil Liberties Union Foundation of Florida (ACLU of Florida) in its 2018 voter guide informed voters that Amendment 4 "includ[ed] any probation, parole, fines, or restitution." *See id.* at 7, and App. at 69. Indeed, the ACLU of Florida and other organizations along with the Sponsor spread a consistent message before and after Amendment 4's adoption. As noted in the Governor's letter, the signatories of the December 2018 letter to then-Secretary Detzner asserting in part that Amendment 4 required payment of "financial obligations imposed as part of an individual's sentence" included the ACLU of Florida as well as Florida Rights Restoration Coalition, the organization that, according to the Secretary, created the Sponsor.[4]

Although the representations to this Court and to the public close the door on any credible suggestion that "all terms of sentence" was *intended* by the Sponsor to refer only to durational periods, we need not address whether Amendment 4

---

4. In a subsequent March 2019 letter to current Secretary Lee, those same organizations and others identified themselves as the "organizations that led the effort to pass Amendment 4." *See* Initial Brief of Governor at 5, and App. at 8, 12.

involved a "bait and switch" attempt to amend our State's constitution. Indeed, our opinion is based not on the Sponsor's subjective intent or campaign statements, but rather on the objective meaning of the constitutional text. The language at issue, read in context, has an unambiguous "ordinary meaning" that the voters "would most likely understand," *Everglades*, 706 So. 2d at 283, to encompass obligations including LFOs. The Sponsor's expressed intent and campaign statements simply are consistent with that ordinary meaning that would have been understood by the voters.

## ANALYSIS

The Governor asks whether the phrase "all terms of sentence," as used in article VI, section 4, encompasses LFOs imposed by the sentencing court. The interpretation of a constitutional provision involves "a question of law." *Crist v. Fla. Ass'n of Criminal Def. Lawyers, Inc.* (*FACDL*), 978 So. 2d 134, 139 (Fla. 2008). In interpreting constitutional language, "this Court follows principles parallel to those of statutory interpretation. First and foremost, this Court must examine the actual language used in the Constitution. If that language is clear, unambiguous, and addresses the matter in issue," then our task is at an end. *Graham v. Haridopolos*, 108 So. 3d 597, 603 (Fla. 2013) (quoting *FACDL*, 978 So. 2d at 139-40).

But this Court has sometimes suggested that the first step in construing a constitutional provision may involve something other than determining the objective meaning of the text. *See, e.g.*, *Williams v. Smith*, 360 So. 2d 417, 419 (Fla. 1978) ("In construing the Constitution, we first seek to ascertain the intent of the framers and voters, and to interpret the provision before us in the way that will best fulfill that intent."). We believe that such statements can be misleading because they may be understood to shift the focus of interpretation from the text and its context to extraneous considerations. And such extraneous considerations can result in the judicial imposition of meaning that the text cannot bear, either through expansion or contraction of the meaning carried by the text. We therefore adhere to the "supremacy-of-text principle": "The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012).

We also adhere to the view expressed long ago by Justice Joseph Story concerning the interpretation of constitutional texts (a view equally applicable to other texts): "[E]very word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it." Joseph Story, *Commentaries on the Constitution of the United States* 157-58 (1833), *quoted in* Scalia & Garner, *Reading Law* at 69.

This Court in construing constitutional language approved by the voters often "looks to dictionary definitions of the terms because we recognize that, 'in general, a dictionary may provide the popular and common-sense meaning of terms presented to the voters.' " *Advisory Op. to Att'y Gen. re Use of Marijuana for Certain Med. Conditions*, 132 So. 3d 786, 800 (Fla. 2014) (quoting *Everglades*, 706 So. 2d at 282). The dictionary meaning of the word "terms," when viewed in isolation, can refer either to multiple durational periods or to multiple obligations or conditions. *See The American Heritage Dictionary* 1796 (5th ed. 2011) (defining "term" as "[a] limited or established period of time that something is supposed to last, as . . . a prison sentence"; and as "a condition").

But the fact that the word "terms" itself can carry different meanings does not render the phrase "all terms of sentence," as used in Amendment 4, susceptible to more than one natural reading. *See Smith v. United States*, 508 U.S. 223, 233 (1993) ("[A] single word cannot be read in isolation . . . ."). As the Supreme Court has explained, "[I]t is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.' " *Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace, Agric. Implement Workers of Am., Int'l Union*, 523 U.S. 653, 657 (1998) (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993)). And when viewed in context,

"all terms of sentence" has only one natural reading—one that refers to all obligations, not just durational periods.

As the Governor and others correctly note, Amendment 4 refers to the voting disqualification arising from "a felony conviction" and later refers to "all terms of" the singular "sentence" resulting from that singular conviction. *See* art. VI, § 4(a), Fla. Const. We know from its explicit reference to "parole or probation" that Amendment 4 uses the term "sentence" to designate more than just imprisonment. And an overall "sentence"—as that word is used in Amendment 4—is naturally viewed as having only one durational term rather than multiple durational terms.

For example, in *Ramirez*, in which the Supreme Court concluded that the Fourteenth Amendment affirmatively authorizes felon disenfranchisement, the Court despite referring collectively to the respondents' "terms of incarceration and parole," 418 U.S. at 34, referred in the singular to an individual felon having "completed the serving of his term," 418 U.S. at 55; *see also id.* at 56-57 (Marshall, J., dissenting) ("Each of the respondents . . . had fully served his term of incarceration and parole."). It would be entirely unnatural, of course, to say that a felon convicted of a singular felony had "completed the serving of his terms" when the time of his incarceration and parole had been completed. Although a singular, overall "sentence" naturally has only one durational term (albeit sometimes with

distinct components), it can have multiple conditions or obligations—i.e., "terms." Indeed, that is the only natural reading of "all terms of sentence."

Certain Non-State Parties advance various arguments for why we should in fact read the words "all terms" to refer solely to durational periods. We are not persuaded by their arguments.

At first blush, the strongest argument advanced by these Non-State Parties is a contextual one. They note that Amendment 4 does not expressly mention LFOs but does mention "parole or probation," which are forms of supervised release that, like incarceration, can each be said to have a durational "term." They thus argue that those two forms of supervised release provide an "illustrative list" to guide this Court "in [its] interpretation of" Amendment 4. *White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 784 (Fla. 2017). This line of reasoning, however, is ultimately premised upon two canons of construction that do not apply in this context.

First, under the *expressio unius est exclusio alterius* canon, "the mention of one thing implies the exclusion of another." *Id.* at 781. But this Court has noted that "[g]enerally, it is improper to apply *expressio unius* to a statute in which the Legislature used the word 'include,' " as that is "a word of expansion, not one of limitation." *Id.* Here, the phrase "parole or probation" comes immediately after the word "including."

- 17 -

Second, under the *ejusdem generis* canon, "where general words or phrases follow an enumeration of specific words or phrases, 'the general words are construed as applying to the same kind or class as those that are specifically mentioned.' " *Marijuana for Certain Med. Conditions*, 132 So. 3d at 801 (quoting *Fayad v. Clarendon Nat'l Ins. Co.*, 899 So. 2d 1082, 1088-89 (Fla. 2005)). Application of the canon thus requires that the enumeration of specifics precede the general words. But Amendment 4 involves the exact opposite: the specific words ("parole or probation") follow the general words ("all terms").

A glaring problem with the arguments advanced by these Non-State Parties is that their preferred reading of Amendment 4 effectively renders superfluous the words "all terms of" in the constitutional text. These Non-State Parties interpret Amendment 4 as if it had *omitted* the words "all terms of" and simply read: "upon completion of sentence including parole or probation." The words "all terms of" serve no meaningful purpose under the reading advanced by these Non-State Parties. This Court, of course, ordinarily avoids interpretations that "render any language superfluous." *Dep't of Envtl. Prot. v. Millender*, 666 So. 2d 882, 886 (Fla. 1996). Indeed, just as we do not "add words" to a constitutional provision, we are similarly "not at liberty to . . . ignore words that were expressly placed there at the time of adoption of the provision." *Pleus v. Crist*, 14 So. 3d 941, 945 (Fla. 2009).

In the end, Amendment 4 was not drafted to require completion of "the term of sentence including parole or probation." Nor was it drafted to require completion of "all terms of . . . incarceration, probation, and parole." *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1216 (11th Cir. 2005) (describing the status of members of plaintiff class in that case). Amendment 4 was drafted to require completion of "all terms of sentence." Art. VI, § 4(a), Fla. Const. That language—which appears to be new to Florida jurisprudence—has only one natural reading.

Perhaps not coincidentally, certain courts—in the specific context of rejecting various challenges to re-enfranchisement schemes that require payment of certain LFOs—have used language similar to "all terms of sentence" to refer to obligations. These cases further undercut the argument that Amendment 4 refers only to durational periods. They demonstrate that phrases such as "all terms of sentence" are naturally understood to encompass more than durational periods.

Most notably, the Supreme Court of Washington used nearly identical language to that at issue here in upholding against certain attacks a re-enfranchisement scheme that required a felon to complete "all requirements of the sentence, including any and all legal financial obligations." *Madison v. Washington*, 163 P.3d 757, 763 (Wash. 2007) (quoting Wash. Rev. Code 9.94A.637(1)(a) (2004)). The LFO requirement there specifically included costs

- 19 -

and fees. *Id.* at 761 n.1. In describing the respondents who were suing to have their voting rights restored, the court noted that each "has satisfied *all of the terms of his sentence, with the exception of full payment of his LFOs*." *Id.* at 762 (emphasis added); *see also State v. Donaghe*, 256 P.3d 1171, 1178 (Wash. 2011) ("In *Madison* . . . , we upheld the disenfranchisement of felons who have satisfied the terms of their sentences, except for paying legal financial obligations."). *Madison*'s reference to "all of the terms of" a singular, overall "sentence" refers to requirements or obligations in addition to durational periods. 163 P.3d at 762.

Two Circuit Courts of Appeals have used somewhat similar language in a related context. *See Johnson v. Bredesen*, 624 F.3d 742, 745, 749 (6th Cir. 2010) (rejecting certain challenges to Tennessee's re-enfranchisement scheme that required felons to among other things have paid all restitution, and describing *Madison* as having upheld "a statute conditioning re-enfranchisement on completion of all terms of felons' sentences, including full payment of their financial legal obligations"); *Harvey v. Brewer*, 605 F.3d 1067, 1070, 1079 (9th Cir. 2010) (rejecting certain challenges to Arizona's re-enfranchisement scheme that required felons to among other things have paid all fines and restitution, and concluding that the state had "a rational basis for restoring voting rights only to those felons who have completed the terms of their sentences, which includes the

- 20 -

payment of any fines or restitution orders"—that is, "only those who have satisfied their debts to society through fulfilling the terms of a criminal sentence").

The similar language used by these courts—all in the specific context of felon re-enfranchisement—underscores that the phrase "all terms of sentence" naturally encompasses obligations. Indeed, in the unrelated context of lawyer discipline, the Supreme Court of South Carolina used a similar phrase in a similar manner. *See In re Allmon*, 753 S.E.2d 544, 545 (S.C. 2014) ("Respondent shall complete all terms of his criminal sentence, including payment of restitution and completion of probation, prior to filing a Petition for Reinstatement.").

We conclude that "all terms of sentence" plainly encompasses not only durational terms but also obligations and therefore includes all LFOs imposed in conjunction with an adjudication of guilt. As explained next, we reject as overly technical the arguments advanced by certain Non-State Parties that Amendment 4 encompasses only some LFOs.

One Non-State Party argues that costs and fees are categorically excluded from "all terms of sentence" because those LFOs do not bear any of the hallmarks of a "sentence." Another Non-State Party argues that Amendment 4 includes only those LFOs mentioned in Florida Rule of Criminal Procedure 3.986(d) (Form for Sentencing) and excludes all LFOs listed in any of rule 3.986's other forms (e.g., Form for Restitution Order (rule 3.986(g)). But these Non-State Parties improperly

view the phrase "all terms of sentence" as a term of art that turns on a nuanced legal analysis of the word "sentence." Indeed, their attempts to isolate and parse the word "sentence" to carve out certain LFOs improperly interprets that word "in a technical sense" absent any "suggest[ion]" in the text of Amendment 4 that the word was to be given something other than its "most usual and obvious meaning." *Wilson v. Crews*, 34 So. 2d 114, 118 (Fla. 1948) (quoting *City of Jacksonville v. Glidden Co.*, 169 So. 216, 217 (Fla. 1936)). These opponents also implausibly suggest that the voters who adopted Amendment 4 would have understood the comprehensive phrase "all terms" to include only those terms that courts deem "punitive." Here, "the natural and popular meaning in which," *id.*, the voters would understand the broad phrase "all terms of sentence" is that it includes all obligations imposed in conjunction with an adjudication of guilt.

The word "sentence" is not defined in the Florida Constitution or seemingly anywhere in the Florida Statutes. But the word is defined in various dictionaries. *See, e.g.*, Sentence, *Black's Law Dictionary* 1569 (10th ed. 2014) ("The judgment that a court formally pronounces after finding a criminal defendant guilty; the punishment imposed on a criminal wrongdoer"). The word is also defined in Florida Rule of Criminal Procedure 3.700(a) to mean "the pronouncement by the court of the penalty imposed on a defendant for the offense of which the defendant has been adjudged guilty." Rule 3.701(b)(2) later explains that punishment is the

"primary" but not the sole "purpose of sentencing." That rule also uses the words "penalty" and "sanction." Fla. R. Crim. P. 3.701(b)(3)-(4).

As one example of why the word "sentence" cannot be construed in an overly technical fashion here, Amendment 4 expressly includes "parole" within its scope, and yet courts have explicitly or implicitly distinguished parole from a "sentence." *E.g.*, *Ramirez*, 418 U.S. at 26 (noting that the respondents had "completed the service of their respective sentences and paroles"). It is for a similar reason—among many others—that the answer to the Governor's question cannot be limited to any one form set forth in rule 3.986. Indeed, parole cannot be captured by any of those forms. Parole, of course, is granted, and its terms set, by the Florida Commission on Offender Review, not by a sentencing judge. *See generally* chs. 947-49, Fla. Stat. (2019). In other words, parole is not "pronounce[d] by the court." Fla. R. Crim. P. 3.700(a).

Amendment 4 thus uses the word "sentence" in its plain, common sense. And it does so in the context of the broad phrase "all terms of sentence." Absent any suggestion in the context of Amendment 4 that the word "sentence" carries a technical meaning restricting its scope, there is no basis to conclude that "all terms of sentence" excludes any LFOs ordered by the sentencing judge. Indeed, an abundance of statutory and case law supports the conclusion that fines, restitution,

and fees and costs all comfortably fit within the ordinary meaning of "all terms of sentence."

Beginning with restitution, this Court has referred to that obligation as part of a "sentence," and even as "punishment." *See, e.g.*, *Noel v. State*, 191 So. 3d 370, 375 (Fla. 2016) ("The 'purpose of restitution is not only to compensate the victim, but also to serve the rehabilitative, deterrent, and retributive goals of the criminal justice system.' " (quoting *State v. Hawthorne*, 573 So. 2d 330, 333 (Fla. 1991))); *Kirby v. State*, 863 So. 2d 238, 244 (Fla. 2003) (recognizing "the trial court's statutory obligation to impose restitution as part of the criminal sanction"); *Glaubius v. State*, 688 So. 2d 913, 914 (Fla. 1997) ("As part of his sentence, he was also ordered to pay restitution to Beall's."); *State v. Champe*, 373 So. 2d 874, 880 (Fla. 1978) ("Punishment in the form of restitution is not a novel concept . . . ."). Indeed, the Supreme Court itself has noted that "[s]entencing courts are required to impose restitution as part of the sentence for specified crimes." *Manrique v. United States*, 137 S. Ct. 1266, 1270 (2017). Certain legislative enactments also support including restitution within the meaning of "all terms of sentence." *See, e.g.*, § 812.15(7), Fla. Stat. (2019) ("The court shall, in addition to any other sentence authorized by law, sentence a person convicted of violating this section to make restitution as authorized by law."); § 921.0026(2)(e),

Fla. Stat. (2019) (authorizing downward departure sentences if "[t]he need for payment of restitution to the victim outweighs the need for a prison sentence").

An analysis of fines looks remarkably similar. Indeed, this Court has referred to fines as part of a "sentence." *E.g.*, *Morganti v. State*, 573 So. 2d 820, 821 (Fla. 1991) ("A lawful sentence may comprise several penalties, such as incarceration, probation, and a fine."); *see id.* ("[A] sentence of five and one-half years' incarceration, eighteen months' probation, and a $10,000 fine is clearly not a more severe sentence than fifteen years' incarceration."). So, too, has the Supreme Court. *See S. Union Co. v. United States*, 567 U.S. 343, 349-50 (2012) (observing that criminal fines "undeniably" fall within the purview of a "sentence"). And, again, certain legislative enactments support including fines within the ordinary meaning of "all terms of sentence." *See, e.g.*, § 775.083(1), Fla. Stat. (2019) ("A person who has been convicted of an offense other than a capital felony may be sentenced to pay a fine in addition to any punishment described in s. 775.082 . . . .").

Lastly, although fees and costs can reasonably be said to differ in many respects from restitution and fines, various court pronouncements and statutory provisions similarly support including them within the scope of Amendment 4's phrase "all terms of sentence." *See, e.g.*, *Osterhoudt v. State*, 214 So. 3d 550, 551 (Fla. 2017) ("[T]rial courts must individually pronounce discretionary fees, costs,

and fines during a sentencing hearing to comply with due process requirements."); *Rollman v. State*, 887 So. 2d 1233, 1234 (Fla. 2004) ("[T]he same sentencing judge pronounced Rollman's sentence, which imposed ten years in prison, ten years of probation, and the payment of restitution and court costs."); *Bassett v. State*, 23 So. 3d 236, 236 (Fla. 2d DCA 2009) ("Bassett was sentenced to five years' prison to be followed by five years' probation. As part of his sentence he was ordered to pay certain costs and fees."); § 27.52(1)(b)1., Fla. Stat. (2019) (authorizing the court to "[a]ssess the application fee [for the appointment of a public defender] as part of the sentence"); § 435.07(1)(b), Fla. Stat. (2019) (referring to "any fee, fine, fund, lien, civil judgment, application, costs of prosecution, trust, or restitution" ordered by the court "as part of the judgment and sentence"); § 633.107(1), Fla. Stat. (2019) (similar).

This Court's decision in *Jackson v. State*, 983 So. 2d 562 (Fla. 2008), is instructive. *Jackson* among other things clarified the definition of a "sentencing error" for purposes of Florida Rule of Criminal Procedure 3.800(b). After noting that the commentary to rule 3.800 technically distinguished "orders of probation, orders of community control, [and] cost and restitution orders" from "the sentence itself," 983 So. 2d at 572 (quoting Fla. R. Crim. P. 3.800 court cmt.), *Jackson* construed "*a defendant's sentence*" to encompass the various "*orders* entered as a result of the sentencing process"—i.e., those "related to the ultimate sanctions

imposed, whether involving incarceration, conditions of probation, or costs," *id.* at 572-73; *see also Kirby*, 863 So. 2d at 244 (referring to "the trial court's statutory obligation to impose restitution as part of the criminal sanction").

Amendment 4's use of the broad phrase "all terms of sentence" can only reasonably be understood to similarly encompass "the ultimate sanctions imposed," including "costs." *Jackson*, 983 So. 2d at 573. Or in the words of the Sponsor's counsel, the phrase encompasses "all obligations" or "all matters."

## CONCLUSION

We answer Governor DeSantis's question by stating that it is our opinion that the phrase "all terms of sentence," as used in article VI, section 4, has an ordinary meaning that the voters would have understood to refer not only to durational periods but also to all LFOs imposed in conjunction with an adjudication of guilt. We express no opinion on any question other than the narrow one presented to us.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, and MUÑIZ, JJ., concur.
LABARGA, J., concurs in result and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result and dissenting in part.

I concur with the majority's ultimate decision that the phrase "all terms of sentence," as used in article VI, section 4 (Amendment 4), encompasses all "legal financial obligations" (LFOs) imposed by the sentencing judge. I do not concur, however, with the majority's conclusion that the phrase "all terms of sentence," as used in Amendment 4, "has an ordinary meaning that the voters would have understood" to include LFOs. Nor do I concur with the majority's strict adherence to the application of the theory referred to as the "supremacy-of-text principle" to the exclusion of available extrinsic evidence that would assist the Court in elucidating the meaning of the text in question.

According to the majority, it adheres to the "supremacy-of-text principle": "The words of a governing text are of paramount concern, and what they convey in this context, is what the text means." Majority op. at 14 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012)). Context is the operative word of this theory. As explained by Justice Scalia in his dissent in *King v. Burwell*, 135 S. Ct. 2480, 2497 (2015), "[S]ound interpretation requires paying attention to the whole law, not homing in on isolated words or even isolated sections. Context always matters." As noted by the majority, the discussion of this approach to interpretation of constitutional texts, later coined "textualism," dates back to as early as the 1800s when Justice Joseph Story, who

served on the United States Supreme Court from 1812 to 1845, emphasized that in interpreting the Constitution, every word must be afforded its "plain, obvious, and common sense" meaning, "unless the text furnishes some ground to control, qualify, or enlarge it." Majority op. at 14. Since that time, textualism has been advocated by justices such as Hugo Black and, in recent history, Antonin Scalia, an ardent supporter of the theory. To be sure, it is a sound theory of interpretation which, in most instances, proves to be determinative. My concern is with its strict disapproval of consideration of extrinsic sources which, in some instances, such as in this case, prove to be not only helpful, but dispositive.

The problem usually arises when the constitutional language in question is uncertain. In such situations, the majority suggests referring to dictionary definitions because "in general, a dictionary may provide the popular and common-sense meaning of terms presented to the voters." Majority op. at 15 (quoting *In re Advisory Op. to Atty. Gen.*, 132 So. 3d 786, 800 (Fla. 2014)). As more fully discussed below, in many instances it is not that simple.

Indeed, this Court has considered other avenues to construe a constitutional provision when the text is unclear or ambiguous. One such avenue is to seek to ascertain the intent of the framers and voters, an approach which, as discussed later, proved to be not only helpful, but determinative in this case.

This Court has long observed that "[t]he fundamental object to be sought in construing a constitutional provision is to ascertain the intent of the framers and the provision must be construed or interpreted in such manner as to fulfill the intent of the people, never to defeat it. Such a provision must never be construed in such manner as to make it possible for the will of the people to be frustrated or denied." *Gray v. Bryant*, 125 So. 2d 846, 852 (Fla. 1960); *see also In re Senate Joint Resolution of Legislative Apportionment 1176,* 83 So. 3d 597, 599 (Fla. 2012) ("When interpreting constitutional provisions, this Court endeavors to ascertain the will of the people in passing the amendment."); *Zingale v. Powell*, 885 So. 2d 277, 282 (Fla. 2004) ("[T]his Court endeavors to construe a constitutional provision consistent with the intent of the framers and the voters." (quoting *Carib. Conserv. Corp. v. Fla. Fish & Wildlife Conserv. Comm'n*, 838 So. 2d 492, 501 (Fla. 2003))); *Williams v. Smith*, 360 So. 2d 417, 419 (Fla. 1978) ("[I]n construing the Constitution, we first seek to ascertain the intent of the framers and voters, and to interpret the provision before us in the way that will best fulfill that intent.").

In taking issue with this consistently applied approach, the majority contends "that such [extraneous considerations] can be misleading because they may be misunderstood to shift the focus of interpretation from the text and its context to such extraneous considerations. And such extraneous considerations can result in the judicial imposition of meaning that the text cannot bear, either through

expansion or contraction of the meaning carried by the text." Majority op. at 14. Thus, according to the majority's approach, clear and unambiguous extrinsic evidence of the true intent of the framers and voters, such as the evidence available in this case, must be disregarded. I respectfully disagree.

Textualist abhorrence of consideration of the intent of the framers of a constitutional or statutory provision has been persistently and stubbornly present throughout the theory's history. Justice Oliver Wendell Holmes, for instance, was quite explicit on the question of intent: "[W]e ask, not what this man meant, but what those words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used . . . . We do not inquire what the legislature meant; we ask only what the statute means." Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417-19 (1899).

I agree with the majority that the lodestar of constitutional and statutory interpretation should be, in the first instance, the application of the words of the governing text read in context. However, the analysis should provide some allowance for consideration of the intent of the framers and voters in instances where it will assist in elucidating the meaning of the text in question.

The majority opinion in this case extensively refers to reliable and unambiguous extrinsic evidence that is dispositive of any question concerning whether the phrase "all terms of sentence" encompasses all LFOs imposed by the

sentencing judge. Nevertheless, in strict adherence to the "supremacy-of-text principle," the majority has chosen to disregard this revealing and helpful extrinsic evidence and rely strictly on its interpretation of the meaning of "all terms of sentence."

The majority opened its opinion with Governor DeSantis's letter of August 9, 2019, requesting this advisory opinion. The letter, includes, inter alia, the responses by counsel for the sponsor of Amendment 4, Floridians for a Fair Democracy, to questions posed by Justices Polston and Lawson during oral argument in 2017. Arguably, these exchanges provide the most helpful revelations concerning what "completion of all terms of sentence" encompassed. Justice Polston pointedly asked whether "completion of [all] terms" included "full payment of any fines," and counsel for the sponsor responded: "Yes, sir . . . all terms mean all terms within the four corners." Majority op. at 2. Justice Lawson similarly asked, "You said that terms of sentence includes fines and costs . . . that's the way it's generally pronounced in criminal court, would it also include restitution when it is ordered to the victim as part of a sentence?" Counsel answered, "Yes." Majority op. at 2.

The majority opinion also includes revelations made in the sponsor's brief, which clearly express the sponsor's intention that payment of all LFOs would be required. The sponsor's brief asserted: "Specifically, the drafters intend that

- 32 -

individuals with felony convictions, excluding those convicted of murder or a felony sexual offense, will automatically regain their right to vote upon fulfillment of all obligations imposed under their criminal sentence." Majority op. at 10. The majority summed up the sponsor's position with the following statement: "In other words, the Sponsor *intended* that 'all terms' refer to obligations, not durational periods. No briefs were submitted in opposition to Amendment 4." Majority op. at 11 (emphasis added).

As a follow-up, the majority included a similar statement, made during oral argument, that the operative language in Amendment 4 "means all matters— anything that a judge puts into a sentence." Majority op. at 11. The majority added:

> As noted in the Governor's letter, that oral argument involved discussion of LFOs—including fines, costs, and restitution—as well as the process for confirming payment of LFOs. *Counsel for the Sponsor summed up by reiterating that Amendment 4 was intended to be "a restoration of voting rights under these specific conditions." It is beyond dispute that the Sponsor expressed the intention that "all terms of sentence" include all LFOs ordered by the sentencing judge.*

Majority op. at 11 (emphasis added).

In further consideration of the sponsor's intent, the majority opinion included an advertisement from the sponsor's paid political website which included the following assurances to prospective voters in bold-italicized text: "Amendment 4 restores the eligibility to vote to people with past felony

- 33 -

convictions who fully complete their entire sentence – including any probation, parole, and restitution – before earning back the eligibility to vote."  Majority op. at 11.

Finally, the majority included in its opinion the American Civil Liberties Union Foundation of Florida's 2018 voter guide which informed voters that Amendment 4 "includ[ed] any probation, parole, fines, or restitution."  Majority op. at 12.

The majority wraps up its discussion of these "extraneous considerations" with the following revealing statement: "The Sponsor's expressed intent and campaign statements *simply are consistent with that ordinary meaning that would have been understood by voters*."  Majority op. at 13 (emphasis added).

This evidence clearly resolves any question regarding the meaning of the phrase "all terms of sentence" and should not be excluded from consideration. Surely, if the text in this case had said, "all terms of sentence, *including payment in full of all financial obligations imposed by the court*," or conversely, "*upon completion of all terms of incarceration of the sentence*," consideration of extrinsic sources, including dictionaries, would not have been necessary.  Unfortunately, for whatever reason, it did not.

Moreover, textualism, for all its usefulness, is less reliable when the text in question, such as the four-word text in this case, is not sufficiently developed to

allow its full meaning to be discernable.  In such instances, consideration of unambiguous extrinsic evidence is essential to determine the meaning of the text in question.  Unfortunately, given the majority's decision today setting forth the so-called "supremacy-of-text principle" as the law of constitutional and statutory interpretation in Florida, such valuable extrinsic evidence will no longer be afforded its due consideration.  While I agree that the initial step in resolving questions of constitutional and statutory interpretation should be to carefully examine the words of the governing text in context, I disagree with the summary exclusion from consideration of extrinsic credible information that would assist in determining the meaning of the text—including the intent of the framers and voters as we have consistently done in the past.

Indeed, without the existence and consideration of the extrinsic evidence concerning the intention of the sponsor and others involved in the process of proposing Amendment 4, based on this record, I could not concur with the majority based solely on the theory that "the only objective evidence for the intent of a text is what the text says understood in context"—not in this case.

Accordingly, I concur with the majority's ultimate decision that the phrase "all terms of sentence" encompasses all "legal financial obligations."  I am able to do so only because the extrinsic evidence presented concerning the sponsor's intent assisted me.  I dissent to the majority's position that the phrase "all terms of

- 35 -

sentence" is unambiguous and that the voters would "most likely understand" it to include all LFOs—without more. I also dissent to the majority's unbending application of the "supremacy-of-text principle" to Florida law, to the exclusion of available extrinsic evidence that would assist the Court in construing constitutional and statutory provisions.

Original Proceedings – Advisory Opinion to the Governor

Joseph W. Jacquot, General Counsel, Nicholas A. Primrose, John MacIver, Colleen Ernst, and James Uthmeier, Deputy General Counsel, Joshua E. Pratt, Assistant General Counsel, Executive Office of the Governor, Tallahassee, Florida,

 for The Honorable Ron DeSantis, Governor of Florida

Theodore Leopold, Diana L. Martin, and Poorad Razavi of Cohen Milstein Sellers & Toll, PLLC, Palm Beach Gardens, Florida; and Cecilia Aguilera and Jon Sherman, Fair Elections Center, Washington, District of Columbia,

 for Interested Party, Fair Elections Center

Jimmy Midyette, Jacksonville, Florida, Julie A. Ebenstein, Rodkangyil Orion Danjuma, and Jonathan S. Topaz, New York, New York, Daniel B. Tilley, and Anton Marino, American Civil Liberties Union Foundation of Florida, Inc., Miami, Florida; Leah C. Aden and John S. Cusick, NAACP Legal Defense & Educational Fund, Inc., New York, New York; and Sean Morales-Doyle and Eliza Sweren-Becker of Brennan Center for Justice at NYU School of Law, New York, New York,

 for Interested Parties, Orange County Florida Branch of the NAACP, the NAACP Legal Defense and Educational Fund, the American Civil Liberties Union Foundation of Florida, the American Civil Liberties Union, The Brennan Center for Justice at New York University Law School, the Florida Conference of the NAACP, and League of Women Voters of Florida

Mark R. Schlakman of Florida State University Center for the Advancement of Human Rights, Tallahassee, Florida,

for Interested Party, Florida Association of Criminal Defense Lawyers (FACDL)

Daniel Bell, General Counsel, J. Michael Maida, Deputy General Counsel, and W. Jordan Jones, Staff Attorney, House Judiciary Committee, Tallahassee, Florida; and Jonathan L. Williams of Lash & Goldberg LLP, Miami, Florida,

for Interested Party, Florida House of Representatives

Adam Richardson, pro se, West Palm Beach, Florida,

Interested party

Jeremiah Hawkes, General Counsel, and Ashley Istler, Deputy General Counsel, The Florida Senate, Tallahassee, Florida

for Interested Parties, The Florida Senate and Bill Galvano, in his official capacity as President of The Florida Senate

Jennifer LaVia and Carla Laroche, pro se, Tallahassee, Florida,

Interested parties

Chad W. Dunn of Brazil & Dunn, L.L.P., Miami, Florida; and Danielle Lang, Molly E. Danahy, and Mark P. Gaber of Campaign Legal Center, Washington, District of Columbia

for Interested Parties, Bonnie Raysor, Diane Sherrill, and Lee Hoffman

Bradley R. McVay, General Counsel, Ashley E. Davis, Deputy General Counsel, Florida Department of State, Tallahassee, Florida; Mohammad O. Jazil and Gary V. Perko of Hopping Green & Sams, P.A., Tallahassee, Florida; and George N. Meros, Jr., and Tara R. Price of Holland & Knight LLP, Tallahassee, Florida,

for Interested Party, the Florida Secretary of State, Laurel M. Lee